Pearle M. HENDRY, Executrix of the Estate of J. W. Shearer, deceased, substituted defendant for J. W. Shearer, deceased, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17556.

United States Court of Appeals Ninth Circuit.

Aug. 27, 1962.

Nixon & Nixon, and W. W. Nixon, Bonners Ferry, Idaho, for appellant.

Sylvan A. Jeppesen, U. S. Atty., and Jim Christensen, Asst. U. S. Atty., Boise, Idaho, for appellee.

Before BARNES, HAMLEY and BROWNING, Circuit Judges.

HAMLEY, Circuit Judge.

In this suit by the United States against J. W. Shearer on two promissory notes, plaintiff recovered judgment in the amount of $8,379.89. Pearle M. Hendry, executrix of the estate of Shearer, appeals from the judgment insofar as it awards recovery (in the sum of $5,720.-

70) on the second of these notes. Appellant contends that this second note never became a binding obligation upon Shearer and that, if it did, Shearer was released therefrom because that note was discharged by the execution of a third note which Shearer did not sign.

On September 15, 1953, Shearer entered into a contract to sell a tract of land in Boundary County, Idaho, to his grandson, Duncan E. Hendry and his wife, Ginnette G. Hendry. Under the contract, forty per cent of all crops grown on the tillable land was to be applied towards payment of the balance due on the contract, with interest at five per cent.

On November 18, 1953, Duncan Hendry borrowed $3,860 from the Farmers Home Administration of the United States Department of Agriculture (Administration). He and his wife, as makers, signed a promissory note in that amount. Shearer signed the note as an accommodation maker, the Administration being aware of his status. The Hendrys gave the Administration a mortgage covering crops and chattels on the tract in question to secure payment of the $3,860 loan. Shearer, pursuant to an agreement which supplemented the land sale contract, also joined in executing this mortgage.

In the fall of 1954, it became necessary for Duncan Hendry to borrow an additional $5,260 from the Administration. A promissory note in that amount was prepared for the signature of Shearer and the Hendrys, and shows the typewritten date of October 4, 1954. The note, however, was not executed on that day.

On October 11, 1954, the Idaho State Field Representative of the Administration transmitted the unexecuted form of the note, and a voucher, to that agency's county supervisor at Bonners Ferry, Idaho. In a memorandum accompanying these papers the county supervisor was advised that the $5,260 loan had been "tentatively" approved on condition that Shearer would co-sign the note and would enter into another agreement supplemental to the real estate contract, agreeing to Duncan Hendry's application for the additional loan. On October 20, 1954, the supervisor wrote to Hendry advising that the loan application was being held in that office until Hendry and Shearer came in and signed the note, and Shearer executed the supplemental agreement.

The two Hendrys and Shearer thereafter signed the note, Shearer as an accommodation maker, this being apparent on the face of the instrument. The exact date on which this note was executed is not revealed by the record. However, since the note was stamped "posted" on October 26, 1954, the signatures must have been obtained on or before that date.

Under the practice of the Administration, money is not loaned on a note until secured by a crop or chattel mortgage. Such a mortgage covering both crops and chattels was executed by the Hendrys and Shearer on November 2, 1954, securing not only this new $5,260 loan, but also the balance then due on the first note. The Administration then deposited the $5,260 in a joint bank account to the credit of the county supervisor and Duncan Hendry. Hendry drew from the account as funds were needed, the signature of the supervisor being required on each such withdrawal.

The dates on which such funds were deposited in the joint account, and on which Hendry began making withdrawals therefrom, are not established in the record. Since, however, it was testified that the loan was made on this note rather than a subsequent note, and the trial court so found, the funds must have been deposited and withdrawals made prior to the spring of 1955, when a third note in the same amount was executed.

In the spring of 1955, officials of the Administration determined that the second note did not conform in certain respects to the regulations of the Administration. Therefore the county supervisor obtained a new note covering the

$5,260 loan at the same five per cent interest rate, but setting out a revised repayment schedule.

The 1954 note provided for an initial payment of interest only on October 1, 1955, and annual payments of $875 on October 1, 1956 and succeeding years, plus interest at five per cent, with a final payment of $885, plus interest, on October 1, 1961. Under the 1955 note, an initial payment of $4365, plus five per cent interest, was called for on October 1, 1955, a $445 payment plus interest would be due on October 1, 1956, with annual payments of $150 plus interest thereafter, the final payment being due October 1, 1959.

This 1955 note was signed by the Hendrys, but not by Shearer. This is likewise true of the crop and chattel mortgage thereafter executed. This instrument of mortgage, while referring to the note of "October 4, 1954," was actually given to secure the third note rather than the second. This is indicated by the fact that the date of last payment of that note is given as October 1, 1959, this being the date of final payment of the third note, but not of the second note.

This third note carries the typewritten date of October 4, 1954, and was marked "Posted 10–26–54." These dates were apparently used only for the purpose of having that note conform to the second note and not to indicate when the third note was actually executed and posted. The third note was not executed until shortly before April 25, 1955, the exact date not being established in the record. Actual posting must have been subsequent to execution of the note. No further crop and chattel mortgage was executed until February 29, 1956.

As before stated, no additional money was loaned on this third note. After execution of the third note the words "Replaced by new note in like amount" were stamped three times on the face of the second note. That note, however, was retained in the files of the Administration.

Only two payments were made on the $5,260 loan represented by the second and third notes. The first of these was made on November 16, 1955, when $744.39 was paid on principal and $247.17 was paid on interest. The second payment was made on December 8, 1955, when $41.90 was paid on principal.

The trial court found that these payments were credited to the second note. In contending that the third note replaced the second note before any payment was made on the latter appellant argues, in effect, that the trial court erred in finding that these payments were credited to the second note.

Walter A. Klundt, who was then assistant county supervisor, testified that no payments were credited to the second note. On the other hand, Ashby D. Nelson, who became county supervisor in 1957, testifying from records which were not introduced in evidence, stated that the November and December payments referred to above were applied to the "second note." But since a payment on principal was due on October 1, 1955, on the third note, but no payment on principal on the second note would have been due until October 1, 1956, the November 16, 1955 payment on principal must have been on the third note. Thus, when Nelson referred to payments being credited to the "second note," he must have meant the second loan.

For the reason just stated the finding of fact that this payment was credited to the second note is clearly erroneous. The Government in effect concedes this point, saying in its brief: "No payments have been credited to the second note (Tr. p. 55), because no loan collections had been received up to the date of taking the third note."

■ The facts recited above make it apparent that appellant's first contention, to the effect that the second note never became a binding obligation, because it was not accepted by the Administration and no money was loaned thereon, is without merit.

■ Not so easily rejected, however, is appellant's alternative argument that Shearer was released from liability on the second note because that note was discharged by execution of the third note.

The trial court held that Shearer was not released from liability on the second note because no evidence was offered tending to show that: (1) the third note was intended to be a payment of the second note; or (2) plaintiff released Shearer from his obligation on his second note.

Section 119 of the Uniform Negotiable Instruments Law[1] sets out five ways in which a negotiable instrument may be discharged. The first two relate to payment and the third to intentional cancellation by the holder. The fourth way in which such an instrument may be discharged is "by any other act which will discharge a simple contract for the payment of money." The trial court negated this method of discharge by finding that no evidence was offered tending to show that the third note was intended as payment of the second.

■ We do not agree. While a subsequent note is presumed not to have been given and accepted in discharge of a prior one, a review of the evidence convinces us that in this case the parties did so intend. The facts do not conform to the usual patterns in which the holder takes a new note as additional security, or extends the obligor's time for payment by taking a renewal note, or gives him alternative methods of discharging his obligation.

The Administration insisted that the Hendrys execute a new note, covering the same indebtedness but with more onerous terms of payment. G. Wayne Thomas, the Administration's area supervisor for Boundary County, testified that the assistant state director wanted the note "revised and set up on a different schedule." Again, he testified that the operating loan officer wanted a "substitute note obtained." Walter A. Klundt, the Administration's assistant area supervisor, testified that the Home Office requested a "new note to replace number 5 [the second note executed by the Hendrys]."

When the third note was executed, the second was stamped "Replaced by new note in like amount." The above testimony indicates that the stamped words were not a misexpression of the parties' purpose, induced by the ready availability of a rubber stamp. Rather, they expressed the intention of the parties that the new note should serve as a complete substitute for the old.

It is significant, too, that the third note bears the same date and posting date as the second. This may be due in part to a desire to keep the Administration's records in good order. It is equally indicative, however, of an understanding by the parties that the third note was to be a complete substitute for the second rather than simply a revision of it or a supplement to it.

---

1. Section 119 of the N. I. L. has been enacted in Idaho as 27 Idaho Code 801. The parties have apparently assumed that this case is governed by Idaho law. But this is not a diversity suit. Jurisdiction in the district court rests on 28 U.S.C. § 1345, pertaining to actions commenced by the United States. The action is one to recover on commercial paper given subject to the provisions of the Bankhead-Jones Farm Tenant Act, as amended, 7 U.S.C.A. § 1001 et seq. (now replaced in large part by the Consolidated Farmers' Home Administration Act of 1961, enacted August 8, 1961, 7 U.S.C.A. § 1921 et seq.) Therefore federal rather than state law governs. See Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; United States v. Standard Oil Company of California, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067. In our opinion the federal law to be applied is the uniform negotiable instruments act, as generally construed by the courts. Since the N. I. L. has been enacted in Idaho in its entirety, the only practical effect of applying federal rather than state law in this case is to expand our inquiry to include decisional law generally in this area.

Finally, on November 16, 1955 the Hendrys paid and the Administration accepted $991.56 on the $5,260 obligation assumed under the second loan. $247.17 of this amount was credited to interest and $744.39 was credited to principal. Later, on December 8, 1955, an additional $41.90 was paid and credited to principal. If the second note were controlling, no payments on principal would have been due at those times. The Hendrys' tender and the Administration's acceptance of payments according to the repayment schedule of the third note indicates that at those times, in the contemplation of both parties, the third note was the only operative evidence of the obligation.

The Government argues that the stamped words "Replaced by new note in like amount" have no legal significance because they were not authorized by any regulation or other authority of the Administration. As we have indicated, their only legal effect was to serve as one indication of the Administration's intention that the third note should serve as a complete substitute for the second. We are not aware of any rule requiring that each step in the office processing of loans and the disposition of commercial paper by a federal agency be supported by specific regulations authorizing the precise action in order for such action to have legal effect. Such a manifestation of an intent to substitute one contractual obligation for another is not plainly beyond the apparent authority of officials dealing with such instruments. The Government did not show that such action was beyond the actual authority of the Administration officials.

The Government does not contend that the Hendrys could have avoided payment of the third note for lack of consideration to them in executing the note and that such note must therefore be disregarded as lacking mutuality. Quite to the contrary, when asked during oral argument in this court what note the Government would have sued on in an effort to recover from the Hendrys, counsel for the Government answered, "The third note." Apart from the fact that the Government has not advanced such an argument, the record indicates that both the Government and the Hendrys proceeded on the basis that the third note was a binding obligation of the latter. Having accepted benefits under the third note and being confronted by no such defense on the part of the Hendrys, the Government, even if it had sought to do so, would probably now be estopped to deny, on this ground, the discharge of the second note.

In our opinion the implied finding of the district court that the second note was not discharged is clearly erroneous. Since that note was discharged, Shearer was released from all liability on it.

This view of the case makes it unnecessary for us to consider appellant's further argument, based on principles of suretyship, that Shearer, as an accommodation maker, was released on the second note because, in requiring the Hendrys to execute a replacement note, the Administration in effect varied the terms of the obligation which Shearer assumed, to his disadvantage and without his consent.

The judgment is reversed and the cause is remanded for entry of judgment in favor of appellant.