CoweN, Chief Judge,
delivered the opinion of the court:
This contract suit is brought under a 1965 agreement between J. E. Robertson Co., herein plaintiff, and the United States, acting through the Department of the Air Force, for the repair and replacement of certain utility systems in Building 3001 at Tinker Air Force Base, Oklahoma, at a price of $100,272.81. Plaintiff is suing for the 'benefit of its excavation subcontractor[1] and its attorney. Plaintiff seeks $6,995.88 in its first claim as an equitable adjustment for an alleged changed condition encountered when its subcontractor removed part of a concrete boiler room floor in order to install new drainage lines. Plaintiff contends that the concrete was substantially thicker than anticipated by either party and that the contract drawings indicated that the thickness of the concrete was approximately six inches. Plaintiff also claims $5,859.25 for attorney’s fees incurred in connection with the contract and the prosecution of plaintiff’s claim thereunder.
The case comes before the court on cross-motions for summary judgment for review, under Wunderlich Act[2] standards, of a decision by the Armed Services Board of Contract Appeals[3] which denied both claims. The pertinent facts and our conclusions with respect to the changed conditions claim will be discussed before our consideration of the claim for attorney’s fees.
Plaintiff’s original bid was made on the basis of the plans and specifications. Defendant notified plaintiff that it was low bidder and invited plaintiff to make a site investigation. *292 In July of 1965 plaintiff’s superintendent and another company official visited Tinker Air Force Base. While examining the concrete floor of the boiler room they observed a hole, approximately five feet long and two to three feet wide, which had been cut in the floor in 1962 in order to repair the original underfloor drainage line. Although the hole was partially covered, plaintiff’s superintendent measured the thickness of the concrete along its edges and found it to be approximately six inches deep. The Board found that the concrete at the hole was from six to six-and-a-half inches thick.
During the site examination, plaintiff’s representatives also informed defendant that certain requirements were impossible and requested new specifications and drawings. Defendant agreed, and although the specifications were not revised, an entirely new set of plans was issued. Plaintiff was asked to bid again [4] on the contract, which was approved by defendant and dated September 20,1965.[5] Thereafter, plaintiff subcontracted the concrete removal to Mecho, Inc., which also sent representatives to investigate the site.
The contract contained the standard Changed Conditions article. The contract Schedule of Items ['Schedule C] contained 13 line items. Items 1 through 7 required the furnishing and installation of various sizes of piping, floor drains and fittings for the underfloor drainage system. Item 8, which set forth the concrete requirements, stated:
Provide approximately 1,670 LF of trench & back-filling, including concrete removal and replacement. Approximately 1,670 LF @ $13.20 TOT AT. 22,044.00
Per LF (EST)
The contract specifications did not indicate the tbicTmp.<aa of the concrete. Paragraph 3-06 provided, however, that all “•[b]uildings shall be restored to their original condition. * * #3?
Schedule B of the contract contained eight sheets of drawings. The only sheet pertinent here is no scale drawing *293 OCBA-F-6598-2, dated April 16, 1965, entitled “floor FLAN SHOWING DRAINAGE FIFING TO BE REPLACED.” One enlarged section of the no scale drawing was captioned “txfical installation of floor drain.” This section depicted a cross-section of the concrete floor. The drawing showed a floor drain which ran through the concrete. The drain was connected to a P-trap below the floor by a nipple. The nipple, as drawn, extended from a point just below the bowl of the drain (the base of which was approximately even with the bottom of the concrete cross section) into a pint on the P-trap. The only measurement on the drawing was a statement that the nipple was six inches long.
After examining this drawing, plaintiff concluded that the concrete floor was approximately six to seven inches thick. Plaintiff reached this conclusion by first comparing the length of the nipple with the cross-section of concrete indicated in the drawing. Plaintiff also compared the concrete cross-section in the drawing with the actual measurements of the Government-approved floor drain and P-trap, when connected by a six-inch nipple. Thus, plaintiff estimated that the floor was not more than six to seven inches thick. This estimate, upon which plaintiff based its bid, was confirmed by the thickness of the concrete in the hole plaintiff observed during the site investigation.
When excavation began, plaintiff’s subcontractor encountered concrete substantially thicker than six inches. In some areas, the floor was 18 to 20 inches deep; in others, it was as thick as 24 inches. Although the record does not indicate the average depth of the floor, the defendant agrees that plaintiff encountered a considerable amount of concrete that was much thicker than six or seven inches.
Plaintiff completed the contract work to the Government’s satisfaction and has exhausted its administrative remedy. The parties stipulated before the Board that if there was a changed condition by reason of the concrete thickness, the equitable adjustment to which plaintiff is entitled is $6,995.88.[6]
The Board found that the depth of the concrete, which plaintiff was required to remove, did not constitute a changed condition within the meaning of either of the two types of *294 changed conditions covered by the Changed Conditions article of the contract. With respect to the first type of change, the Board found that the contract drawings did not show the thickness of the concrete floor to be cut out and excavated. As to the second type of changed condition, the Board found that plaintiff as an experienced contractor, should have anticipated that the concrete floor would be substantially thicker than six inches in some places. In challenging both the findings and conclusions of the Board, plaintiff’s position is that there was a changed condition under both clauses of the Changed Conditions article.
Defendant’s position is that plaintiff is not entitled to recover under either clause. Defendant argues that the drawing in question did not contain a representation of the depth of the concrete and asserts that the Board’s finding to that effect should be upheld. Defendant also contends that plaintiff may not recover under the second clause, because the Board’s findings are supported by substantial evidence.
The first clause of the Changed Conditions article permits an equitable adjustment if the contractor encounters subsurface or latent conditions differing materially from those indicated in the contract. Foster Constr. C.A. v. United States, 193 Ct. Cl. 587, 594, 600-604, 435 F. 2d 873, 876, 880-882 (1970); United Contractors v. United States, 177 Ct. Cl. 151, 159-61, 165 n. 6, 368 F. 2d 585, 59A-5, 597 n. 6 (1966); S.T.G. Constr. Co. v. United States, 157 Ct. Cl. 409, 414-15 (1962). As there is no dispute that the conditions encountered differed materially from those plaintiff anticipated, the central question is whether the contract drawings contained indications that the floor would be as plaintiff expected it to be. This determination involves an interpretation of the contract and presents a question of law to be decided by the court. E.g., Kaiser Indus. Corp. v. United States, 169 Ct. Cl. 310, 330-31, 340 F. 2d 322, 333 (1965). We agree with plaintiff that the contract contained indications as to the thickness of the concrete floor within the meaning of the Changed Conditions clause. Foster Constr. C.A. v. United States, supra, pp. 2, 12-13. Although the Board concluded that the contract drawings did not indicate the thickness of the concrete, we think its interpretation is incorrect. It is not necessary that *295 indications in the contract be explicit or specific. The evidence is undisputed that plaintiff compared the length of the nipple (marked six inches on the drawing) with the cross-section of the floor shown thereon. The evidence is equally undisputed that plaintiff compared the drawing with the actual measurements of the Government-approved floor drain and P-trap when connected with a six-inch nipple. Moreover, plaintiff’s estimate of the thickness of the concrete, based on the foregoing, was confirmed by the site investigation and particularly by the thickness of the concrete around the edges of the hole in the floor.
The Board stated that plaintiff’s only testimony with respect to this drawing was given by its job superintendent. That is not the case. A representative of Mecho, Inc., testified that prior to excavation, he interpreted the drawing as indicating the concrete would be four to six inches thick. On cross-examination, one of defendant’s witnesses in considering the same drawing contained on an earlier plan[7] stated he would estimate the concrete to be seven and one-half to eight inches thick.
We conclude that the contract drawings contained indications sufficient to cause plaintiff reasonably to expect subsurface or latent conditions, which differed materially from those actually encountered. Accordingly, plaintiff is entitled to an equitable adjustment in the stipulated amount, $6,995.'88. In view of this holding, we find it unnecessary to consider whether there was a changed condition within the meaning of clause (b) of the Changed Conditions article.
II
Plaintiff also seeks to recover $5,859.25 for attorney’s fees incurred in connection with the contract. Plaintiff claims $859.25 for legal services rendered in negotiations concerning a proposed partial termination for convenience by the Government, $4,000 for the prosecution of claims before the administrative board and $1,000 for bringing this action. The *296 board has considered and denied tbe first two parts of this claim. 'We bold tbat plaintiff may not recover any part of tbe claim.
Plaintiff’s first argument is tbat, although tbe contract was never actually terminated, plaintiff is entitled to recover $859.25 under the provisions of 41 U.S.C. § 106(d) (8) [8] and paragraph (e) of tbe termination clause, “General Provision 24. Termination for Convenience of tbe Government.”[9] We reject these contentions. Plaintiff may not recover under 41 U.S.C. § 106(d) (3), tbe Contract Settlement Act of 1944, for tbe provision upon which plaintiff relies applies only to terminated wartime contracts. Secondly, tbe termination clause permits a claim for such expenses only where tbe contract has actually been terminated. Here tbe contract was never terminated in whole or in part.
Plaintiff argues tbat Oklahoma law entitles it to recover tbe $5,000 it incurred for attorney’s fees in prosecuting its claims before tbe board and in this court. However, tbe right to recover attorney’s fees is a matter of Federal law. Clearfield Trust Co. v. United States, 318 U.S. 363 (1943); United States v. Allegheny County, 322 U.S. 174, 183 (1944). The statute governing tbe recovery of costs in actions brought by or against tbe United States provides tbat attorney’s fees may not be recovered unless tbe allowance of such fees is *297 specifically authorized by some statute.[10] There is no statute providing for the recovery of the fees claimed here. Furthermore, attorney’s fees for prosecuting disputes before the administrative boards have been held to be not recoverable, because they were not incurred in performance of the contract. Dale Constr. Co. v. United States, 168 Ct. Cl. 692, 738 (1964).
ni
Plaintiff’s motion for summary judgment is granted in part; judgment is hereby rendered in its favor in the amount of $6,995.88. Plaintiff’s motion is denied in all other respects. Defendant’s motion is denied in respect to the changed conditions claim. It is granted in respect to plaintiff’s claim for attorney’s fees.

 Plaintiff subcontracted with Mecho, Inc. Tbis aptlpn Is for the benefit of Mecbo’s successor In Interest, N. J. Mortensen.

 68 Stat. 81, 41 U.S.C. §§ 321-22 (1964).

 ASBCA No. 11340, 68-2 BCA ¶ 7153,

 The contract as awarded states it was actually negotiated nursuant to 10 U.S.C. § 2304(a)(1) (1964).

 The contract price was originally $102,471.05. The parties entered a supplemental agreement on January 7, 1067, reducing the price to $100,272.81. The agreement stated it “[h]as no effect on any other claims pending against this contract.”

 Defendant’s Br. p. 8, n. 2.

 Drawing BH-528, dated August 22, 1942. It was from this drawing, made when the original drainage system was installed, that the pertinent part of OCBA-E-6596-2 was reproduced.

 Act of July 1, 1944, c. 358, 58 Stat. 652, 41 U.S.C. § 106 (1964).

 Relevant paragraphs of the termination clause are:
“(c) After receipt of a Notice of Termination, the Contractor shall submit to the Contracting Officer his termination claim, in the form and with the certification prescribed by the Contracting Officer. Such claim shall be submitted promptly but in no event later than one year from the effective date of termination, unless one or more extensions in writing are granted by the Contracting Officer, upon request of the Contractor made in writing within such one year period or authorized extension thereof. However, if the Contracting Officer determines that the facts justify such action, he may receive and act upon any such termination claim at any time after such one year period or extension thereof, upon failure of the Contractor to submit his termination claim within the time allowed, the Contracting Officer may, subject to any Settlement Review Board approvals required by Section VIII of the Armed Services Procurement Regulation in effect as of the date of execution of this contract, determine, on the basis of information available to him, the amount, if any, due to the Contractor by reason of the termination and shall thereupon pay to the Contractor the amount so determined.
* * * * *
“(e) In the event of the failure of the Contractor and the Contracting Officer to agree as provided in paragraph (d) upon the whole amount to be paid
*297 to the Contractor by reason of the termination of work pursuant to this clause, the Contracting Officer shall, subject to any Settlement Review Board approvals required by Section VIII of the Armed Services Procurement Regulation in effect as of the date of execution of this contract, determine, on the basis of information available to him, the amount, if any, due to the Contractor by reason of the termination and shall pay to the Contractor the amounts determined as follows
* * * * aft

 Act of June 25, 1948, e. 646, 62 Stat. 973, 28 U.S.C. §2412 (1964), as amended, (Supp. V, 1965-1969).